# **EXHIBIT 5**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**AMIR KAKI, M.D.,** *an individual,*
and **MAHIR ELDER, M.D.,** *an individual*,

      Plaintiffs,

vs.

Case No. 19-014985-CD
Hon.  Annette J. Berry

**TENET HEALTHCARE CORPORATION**,
*a foreign for-profit corporation,* **VHS, INC.,** *a foreign for-profit corporation,* **VHS OF MICHIGAN, INC**, *a foreign for-profit corporation,* d/b/a Detroit Medical Center ("DMC"),**VHS HARPER-HUTZEL HOSPITAL, INC.**, *a foreign for-profit corporation,* **VHS SINAI-GRACE HOSPITAL, INC.,** *a foreign for-profit corporation,* **VHS DETROIT RECEIVING HOSPITAL, INC.,** *a foreign for-profit corporation,* jointly and severally, Collectively DMC and/or TENET), and **DR. ANTHONY TEDESCHI**, President of VHS OF MICHIGAN and CEO of DMC, *an individual*, **SCOTT STEINER**, CEO of HARPER UNIVERSITY HOSPITAL, DETROIT RECEIVING, AND HUTZEL HOSPITAL, **CONRAD MALLET**, CEO SINAI-GRACE HOSPITAL, *an individual*, **JOHN LEVY**, JOINT CONFERENCE COMMITTEE CHAIR, *an individual,* and **JOHN HAAPANIEMI**, CHIEF OF STAFF and CHAIR OF THE MEDICAL EXECUTIVE COMMITTEE, *an individual,*  **DR. MEHMET BAYRAM,** at HURON VALLEY-SINAI HOSPITAL, **SHAWN LEVITT,** Group Chief Nurse Executive, Chief Nursing Officer-Children's Hospital of Michigan/DMC/Tenet, **FRANK TORRE,** Chairman of the Board of Directors at DMC, **DR. RUDOLPH P. VALENTINI,** American Board of Pediatrics, DMC/Children's Hospital of Michigan, **ERICA WARD GERSON,** Chairman of the Board of VHS Children's Hospital of Michigan, Inc., **ALAN WOODLIFF**, and **KEITH B. PITTS,** Former Co-Vice Chairman, Tenet Healthcare Corporation, *jointly and severally,*

      Defendants.

> **PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND**

19-014985-CD FILED  IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   12/11/2019 4:51 PM   Mai Xiong

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs AMIR KAKI, M.D. and MAHIR ELDER, M.D., by and through their counsel, **Deborah Gordon Law**, and hereby files their First Amended Complaint against Defendants as follows:

## CLAIMS,  PARTIES, AND JURISDICTION

1.      This is an action for violations of the law with regard to the retaliatory removal from and failure to re-appoint Plaintiffs to their long held positions as Doctors with medical staff privileges  at Defendant Hospitals in violation of the Michigan Medicaid False Claims Act, MCL § 400.610c; the False Claims Act, 31 USC SS 3730, and the Public Policy of the State of Michigan; for concurrently placing Plaintiffs illegally in a False Light; Tortuously Interfering with their Beneficial Business Relationships and Expectancies, and subjecting them to  Intentional Infliction of Emotional Distress. This is also an action for violation of the Michigan Whistleblowers Protection Act, MCL SS 15.361 *et. seq.*  based upon retaliation against Plaintiffs because Plaintiffs filed a lawsuit against some of these Defendants on March 25, 2019, alleging illegal retaliation and for Breach of Contract for Violations of the Medical Staff By-Laws based on illegal retaliation. In addition, Defendants DMC and/or Tenet violated the Bullard-Plawecki Employee Right to Know Act, MCL§ 423.501, *et. seq.*, when they failed to provide Dr. Kaki with his personnel record.

2

2.      This lawsuit addresses violations of the law that occurred after Plaintiffs were terminated from their employment with Defendants as Director of the Cardiac Catherization Services Unit (Dr. Kaki) and Director of the Cardiac Care Unit and other leadership positions (Dr. Elder) on October 1, 2018.   As alleged in other litigation, to be filed in arbitration, those terminations of employment were based on retaliation for Plaintiffs' reporting of and refusal to acquiesce in violations of the law.

3.      Plaintiff Dr. Amir Kaki, M.D., ("Plaintiff," "Plaintiffs," or "Dr. Kaki"), is a current resident of the County of Oakland, State of Michigan.

4.      Plaintiff Dr. Mahir Elder, M.D., ("Plaintiff," "Plaintiffs," or "Dr. Elder"), is a current resident of the County of Wayne, State of Michigan.

5.      Defendant TENET HEALTHCARE CORPORATION, INC., ("Tenet") is a foreign for-profit corporation.  It is a multi-national, investor-owned healthcare services company.  As of December 2018, Tenet operated 68 hospitals nationally.  Tenet does business, and has numerous subsidiaries it operates and controls, in the State of Michigan.

6.      VHS OF MICHIGAN, INC., a wholly-owned subsidiary of VHS, Inc., is a foreign for-profit corporation and doing business in Detroit, Michigan as The Detroit Medical Center ("DMC"), a Michigan corporation with its principal place of business in Wayne County Michigan.

7.      VHS HARPER-HUTZEL HOSPITAL, INC., a foreign for-profit corporation, is part of the DMC, doing business in Michigan as Harper-Hutzel Hospital (comprising Harper University Hospital, Hutzel Women's Hospital, the CardioVascular Institute and DMC Surgery Hospital).

8.       VHS SINAI-GRACE HOSPITAL, INC., a foreign for-profit corporation, is part of the DMC, doing business in Michigan under different names, including Sinai-Grace Hospital

and DMC.

9.      VHS DETROIT RECEIVING HOSPITAL, INC., a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan under different names, including among others as Detroit Receiving Hospital and DMC.

10.     Defendant Anthony Tedeschi ("Tedeschi") is a licensed Medical Doctor. Tedeschi has been the Chief Executive Officer ("CEO") of the DMC since January 2017. Tedeschi previously served as the CEO of the Chicago Market of Tenet. He is a resident of the State of Michigan.

11.     Defendant Scott Steiner ("Steiner") was the CEO of the adult DMC hospitals beginning in 2012 and ending on February 8, 2019. He is a resident of the State of Michigan.

12.     Defendant Conrad Mallet Jr. ("Mallet") has been the CEO of Sinai-Grace Hospital since August 14, 2017. He is a resident of the State of Michigan.

13.     Defendant John Levy ("Levy") serves as Chair of the Joint Conference Committee (JCC) at the DMC, overseeing in part doctor clinical privileges. He is a resident of the State of Michigan.

14.     Defendant John Haapaniemi is Chief of Staff and Chair of the Medical Executive Committee.

15.     Defendants Drs. Mehmet Bayram and Rudolph P. Valentini are doctors affiliated with Tenet/DMC hospitals, and are members of the JCC at issue here.

16.     Defendant Shawn Levitt is Chief Nursing Officer at a DMC Hospital and was a member of the JCC at issue here.

17.     Defendant Erica Ward Gerson is Chair of the Board of VHS Children Hospitals and was a member of the JCC at issue here.

4

18.     Defendants Alan Woodliff and Keith Pitts are or were employed by Defendants DMC/Tenet and were members of the JCC at issue here.

19.     The amount in controversy herein exceeds $25,000.00 and this matter is otherwise appropriately before this court.

## FACTUAL BACKGROUND

20.     Plaintiff Dr. Kaki is a cardiologist specializing in nuclear cardiology, internal medicine and interventional cardiology. He was a Clinical Associate Professor of Medicine at Wayne State University School of Medicine and an Assistant Program Director of Interventional Fellowship at Wayne State University School of Medicine.

21.     Dr. Kaki had uninterrupted medical staff privileges at the DMC since 2012.

22.     The DMC Heart Hospital is in the center of Detroit, where there are extremely high rates of heart disease, heart failure and high blood pressure.

23.      The DMC Heart Hospital features the full range of heart specialists: cardiologists, cardiac surgeons, vascular surgeons, pediatric cardiovascular surgeons and a nursing team that is cross-trained for any emergency or elective procedure.

24.     Dr. Kaki is renowned for many high-risk procedures and vascular access techniques, is a pioneer in the area of mechanic circulatory support, and has published original manuscripts related to large bore vascular access and the use of mechanical circulatory support in high impact peer review journals.

25.     Dr. Kaki was nominated and completed the Tenet Leadership Academy. This program identifies talented leaders to be groomed for future roles. Dr. Kaki was recruited from Cornell Medical School by City of Detroit Mayor Michael Duggan and then DMC President Dr. Ted Schreiber to become employed as set forth above.

26.     Plaintiff Dr. Elder is an interventional cardiologist who specializes in cardiology, endovascular cardiology, nuclear cardiology, internal medicine and interventional cardiology.

27.     Dr. Elder had uninterrupted medical staff privileges at the DMC for over two decades.

28.     Since 2007, Dr. Elder held other titles including Clinical Professor of Medicine at Wayne State University School of Medicine, Assistant Program Director of Interventional Fellowship at Wayne State University School of Medicine and Clinical Professor of Medicine at Michigan State University.

29.     Dr. Elder was voted "Teacher of the Year" for 10 consecutive years by DMC cardiology fellows.

30.     Dr. Elder was named "Top Doc" in Hour Detroit Magazine, as voted by his peers, for years 2012 through 2018 and nominated for this title for 10 consecutive years.

31.     Dr. Elder was twice awarded the distinction of Crain's "Health Care Hero" in 2011 and 2017.

32.     Dr. Elder has also been honored by local churches and community organizations for compassionate care.

33.     Dr. Elder was the primary investigator of multiple national clinical trials that brought research recognition to the DMC.

34.     Dr. Elder is a national pioneer in treatment of patients with Pulmonary Embolism disease ("PE"), and started the first PE response team in Michigan.  He is one of the leaders in PE research in the nation.  He has co-authored books and chapters regarding this disease.

35.      Plaintiffs are known and recognized for helping build the nationally-acclaimed programming for the DMC Heart Hospital beginning in 2010.

### For-Profit Tenet Buys DMC and Continues its Focus
### on Profit at the Expense of Patient Care

36.     Defendant Tenet owns for-profit hospitals throughout the country.

37.     In 2013, Tenet purchased VHS, Inc., and owned DMC when the Heart Hospital opened its doors in July 2014.

38.     Much of the money that Defendants Tenet and DMC receive comes from state and federal Medicare and Medicaid funds. Those funds are regulated pursuant to state and federal law.  Medicare and Medicaid fraud is a crime.

39.     Tenet has a history of violating the law in order to enrich the company, its owners and Tenet hospitals.

40.     In 2006, Tenet agreed to pay the Department of Justice ("DOJ") $725 million to settle allegations of illegal Medicare payments to Tenet hospitals and entered into a 5-year corporate integrity agreement that required the company to provide financial reports to the government.

41.     In 2012, Tenet agreed to pay $42.75 million to resolve allegations that it violated the False Claims Act by overbilling Medicare.

42.     In September 2016, Tenet entered into a "Settlement Agreement" and No Prosecution Agreement ("NPA") with the United States and certain states.  It agreed to pay a $514 million dollar fine for engaging in healthcare fraud by making false claims for public funds under a kickback scheme relating to certain alleged medical services.

43.     In addition, in January 2017, the DOJ indicted the Tenet Healthcare Senior VP of Operations, John Holland, on four counts of fraud. The indictment states that Holland and others were part of a larger scheme to "unlawfully enrich themselves, Tenet, and the Tenet Hospitals" by engaging in fraud. Specifically, Mr. Holland sidestepped Tenet's internal accounting controls to

bribe clinicians and pay illegal kickbacks to clinics in Georgia and South Carolina that referred pregnant patients on Medicaid to Tenet hospitals. The scheme allegedly helped Tenet bill Medicaid programs for more than $400 million.

44.     In September 2017, several more charges were brought against Mr. Holland. The latest indictment charged Holland with conspiracy to violate the federal Anti-Kickback Statute, wire fraud and falsification of books and records.

45.     As part of the various agreements Tenet has entered into with the government, they are required to "self-report" any violations of law or regulations and any questionable conduct.  Senior management, including these executive Defendants, have failed to do so and have blatantly allowed legal violations to occur in order to generate more income by cutting medically necessary support and services and allowing unnecessary medical procedures, among other things.

46.     Tenet has been very clear that its sole goal is to make a profit, as stated publicly by Tenet CEO Ron Rittenmeyer:

> "We're in the business to make a profit – number 1 … That's our job, so we're always going to be looking to reduce costs. That's just the facts."

### Plaintiffs Report and Refuse to Acquiesce in Violations of the Law Which Compromised Patient Safety

47.     Defendants' improper and fraudulent conduct at the DMC reported by Plaintiffs, includes, but is not limited to:

a. Operating and billing Medicare and Medicaid for procedures knowing that the surgical equipment used in many procedures were not sterile;
b. Knowingly putting patients at risk of contracting life-threatening diseases;
c. Knowingly submitting claims for payments to CMS and the State of Michigan that were false and/or fraudulent; and
d. Knowingly allowing physicians to conduct medically unnecessary procedures

48.     Throughout the course of their business relationships with Defendants, Plaintiffs reported multiple, significant violations of the law at Defendant hospitals to Tenet legal, Tenet compliance, DMC leadership, and Defendants Tedeschi and Steiner. Plaintiffs refused to acquiesce in these violations.

49.     In addition, Plaintiffs complained of Defendants unilaterally cuts to staff and services without physician input, which compromised patient safety and at times led to unnecessary deaths and/or an unsafe environment for patients.

50.     In the spring of 2018, Defendants without advance notice to or consultation with the medical leadership, removed the life-saving Stat Blood Lab from the Cardiac Catherization Unit ("CCU") as a cost-cutting measure. This created an immediate and serious patient safety issue, as time is of the essence in receiving blood work results for cardiac patients.  In fact, one patient died because his high potassium levels were not reported to the cardiac team for hours.

51.     Plaintiffs met with Defendants Tedeschi and Steiner, among others, to insist that the Stat Blood Lab immediately be returned to the CCU.  On March 8, 2018, Steiner acknowledged that Plaintiffs had raised the removal of the Lab as a patient safety concern, including the resulting death of a patient, and stated that the lab would be moved back to the CCU.

52.     Plaintiffs brought concerns about physician competency and unnecessary and/or dangerous procedures to DMC leadership and to peer review meetings in order to ensure that the procedures, some of which resulted in deaths, be investigated. Neither the physicians whose procedures were being questioned nor any of the Defendants welcomed the reports and peer review requests sought by Plaintiffs.  To the contrary, Plaintiffs demands for accountability led to complaints about them from the physicians at issue who were backed up by the DMC due to their generation of revenue by their faulty procedures, and later, to Plaintiffs' terminations.

53.     In 2017, Plaintiffs exposed a violation with regard to the DMC Cardiovascular Institute, which provided "Cardio Team One" ("CTO") on-call coverage to Detroit Receiving Hospital. Participating cardiologists were required to provide "Restricted On-Call Coverage" between 7:00 p.m. and 7:00 a.m. by being "present in the emergency department or on an inpatient unit within minutes from being called to evaluate and treat patients with ST elevation myocardial infarction…and other cardiac conditions."

54.     DMC advertised to the public via television, billboards, the internet, and radio that cardiologists were on site "24/7" to handle sudden heart attacks and other emergencies, a unique feature of their Heart Hospital, to encourage patients to use their services.

55.     However, certain cardiologists assigned to restricted on-call coverage were being paid even though they were not in the emergency department or on a hospital unit; they were not even on the premises as required, thus negating the emergent, life-saving purpose of the restricted on-call coverage.  From 2016-2018, Plaintiffs reported this to Defendants both verbally and in writing.

56.     In April 2017, Plaintiffs expressed concern with regard to the medical quality assurance ("Q/A") meetings that resulted in cover-ups for poor medical outcomes.  Dr. Elder reported in writing that Defendants were "complicit" in facilitating a "toxic culture" of "enterprise before the patient."  Plaintiffs further reported that Q/A had members who were not "peers" and were unqualified to assess quality, and that qualified doctors who were experts had been intentionally excluded because they were advocates for patients and quality.

57.     In September 2017, Dr. Elder documented to Defendants his concerns that the absence of skilled nurses in the Cath Lab had reached a critical point, resulting in a "severe decrease in the quality of care."

## **Defendants Retaliate Against and Terminate Plaintiffs**

58.     By August 2018, Defendants sought a way to force Plaintiffs to resign, or if necessary, to terminate them from their employment relationship in retaliation for the actions described aforesaid.

59.     In late September 2018, Defendants pressured Plaintiffs to resign and used threats to induce them to do so.  The effort failed.

60.     In response, on October 1, 2018, Dr. Elder sent an email to Defendants Tedeschi and Evans stating, in pertinent part:

> "I will not be extorted!  . . .  You apparently are bent on also tarnishing my reputation that I have worked my entire life to earn.  I realize Tenet is a large corporation whose primarily motivation is to make money and please its constituents.  However, I am a physician and will never accept the fact they continue to put profits over patient safety and carry on as if it is simply the cost of doing business.  Especially egregious is the disregard for human life, all humans regardless of their socio economic status are entrusting us.  Tenet must change its ways and know it cannot get away with these policies even if it is against populations of less privilege and people of color.
>
> I was led to believe that it [the Latham and Watkins investigation] was designed to address my concerns regarding quality, patient safety and vulnerable patients.  It stead, it is obvious that it was designed to advance an agenda to silence [ ] patient advocates and 'kill the messengers.'  This is clearly retaliation which is intent on punitive damage to those who place patients over profits.  Tarnishing my good reputation will not advance Tenet leadership, nor change the facts regarding patient safety.  I am in complete protest of this investigation, it was an excuse to find a way to silence the advocates and not address the patient quality and safety concerns at DMC-Tenet hospitals." [typographical errors in the original].

61.     Later, on **October 1, 2018,** both Plaintiffs were abruptly terminated from their leadership positions.  As of that time, and throughout their employment with the Defendants, Plaintiffs had excellent reputations in the medical community, no record of any policy violation or wrongdoing, no administrative complaints by a state agency, no malpractice lawsuits and no patient complaints.

62.     After their terminations Plaintiffs were no longer salaried employees, but they remained at Defendant Hospitals with medical staff privileges serving patients and earning income in that capacity.

63.     On **March 25, 2019 Plaintiffs** filed a lawsuit against some of these Defendants alleging retaliation based on their terminations of employment.

### Defendants Retaliate Against Plaintiffs Post-Termination, Including Removing/Failing to Re-New their Privileges to Practice at the DMC

64.     Based on Plaintiffs' ongoing complaints about fraud and safety while still employed as Directors, Dr. Elder's public response to the terminations including that he refused to "stay quiet about safety concerns," and the lawsuit they filed, Defendants retaliated against Plaintiffs in their roles as staff physicians with medical privileges

65.     Defendants retaliated against Plaintiffs by prohibiting them from participating in Peer Review and Quality Assurance Committees. The only cardiologists restricted from participating in quality committees and sub-committees were the Plaintiffs.  DMC changed the entire process of quality assurance to the exclusion of Plaintiffs in order to stop their strong advocacy for patient safety and critic of bad operators with bad outcomes.

66.     The retaliation included, but was not limited to: removal of pagers, prohibition on teaching and/or giving lectures, removal from the Fellowship Faculty, failure to refer patients to them, attempts to steal Plaintiffs' patients who visit the ER, disparagement of them and a prohibition on serving on subcommittees in Peer Review, privileges that were allowed for other physicians with medical staff  privileges.

67.     As set forth above, on **March 25, 2019** Plaintiffs filed a federal lawsuit against some of these Defendants for violations of the law.

68.     The suit earned significant media attention and Plaintiffs' claims were covered by

the Detroit Free Press, the Detroit News, Crains and other media outlets.

69.     On **April 29, 2019**, in a letter signed by Defendant Dr. Levy, and in conjunction with Defendant Dr. Tedeschi, Plaintiffs were advised that their privileges to practice medicine at the DMC were not being renewed.

70.     Defendants subsequently notified all DMC departments that Plaintiffs had lost their privileges.

71.     Pursuant to the DMC Medical By-laws, "[a]ll decisions regarding membership and privileges shall be made by the Governing Body in accordance with the procedures described in Medical Staff Policy.  The Governing Body shall act only after there has been a recommendation from the Medical Executive Committee (MEC)."

72.     Upon information and belief, the Medical Executive Committee ("MEC") voted in favor of renewing Plaintiffs' privileges, a decision that was overturned by Defendants Tenet and DMC executives, and the JCC.

73.     Such an action is very rare if not unprecedented.

74.     All four reasons cited in Defendants' April 29, 2019 letter for not renewing Plaintiffs' clinical privileges were pretextual. Plaintiffs never received a single written communication regarding any problems with their performance or explaining why their privileges were at issue.

75.     Pursuant to the DMC Medical Staff By-Laws Plaintiffs were entitled to and availed themselves of an Appeal by the Medical Review Committee Hearing Panel.

76.     On or around October 10, 2019, the Review Committee concluded that the adverse recommendation by the JCC was "incorrect, unjustified, unreasonable, not substantiated by the evidence and unfounded."

77.     As of today's date Plaintiffs have not had their privileges re-instated. It is the intent of the JCC to retaliate against Plaintiffs by ensuring that they do not receive medical privileges in spite of the finding in their favor.

78.     A removal of privileges has career changing ramifications. Irreparable harm will be caused would be caused if the Adverse Recommendations are not rejected. The DMC will be required to file an adverse action report with the National Practitioner Data Bank ("NPDB"). This report will result in aggressive scrutiny by hospitals and others required to query the NPDB, investigation by the Michigan Board of Medicine, higher malpractice insurance premiums and disclosure to health plans and insurers. Once a NPDB report is made it results in a stain on a physician's reputation that can never be erased.

79.     The procedures Defendants used with regard to the failure to renew Plaintiffs' clinical privileges were out of the ordinary and contrary to those outlined in the DMC Medical Bylaws which govern the removal or failure to re-appoint privileges; the JCC Defendants did not provide Plaintiffs with the procedures required prior to taking action against them, including, but not limited to, making an "objective and evidence-based decision."

80.     Defendants became obsessed with removing Plaintiffs from all the DMC buildings so that they were unable to view and point out illegal actions and to ruin Plaintiffs' careers as retaliation for their reporting and filing this lawsuit.

81.     Defendant JCC members have subsequently taken further steps during the appeal process to ensure that Plaintiffs are unable to receive full medical staff privileges.

**Defendants Withhold Personnel Record,**
**Including Alleged Reasons for Terminations**

82.     Shortly after being terminated, Dr. Kaki contacted Defendants and requested his personnel record, pursuant to the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501,

14

*et. seq.*, in order to obtain the Standard of Conduct "violations," "review," "complaints" and/or "investigation" Defendants publicly stated they relied on for his termination of employment as a directive.

83.     MCL § 423.510 defines "personnel record" as "a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action."

84.     Defendants refused Dr. Kaki's request, taking the legally unsupportable position that in his role as the Director of the Cardiac Catherization Unit he was not an "employee" of the DMC or any DMC Hospital and therefore was not entitled to his own personnel record.

85.     Dr. Kaki was forced to file a lawsuit in Wayne County Circuit Court to obtain his personnel record pursuant to MCL § 423.501, *et. seq*. Desperate to keep the "investigation" away from him, Defendants hired lawyers to appear in Court to argue that Dr. Kaki should not be able to obtain his personnel record, including the as yet unspecified reasons for his firing.  Defendants sought and continue to seek to make false public statements about Plaintiffs with regard to an "investigation," and "violations," while refusing to hand over any evidence thereof.

86.     Pursuant to state and federal law, and based upon their job descriptions, created by Defendants, and their leadership roles, Dr. Kaki and Dr. Elder were clearly "employees."

87.     Defendants falsely claim that Plaintiffs were "independent contractors," not employees, although neither Plaintiff would be considered as such under state or federal law.

88.     In fact, Defendants have intentionally misclassified Plaintiffs – and likely others – under the law as "independent contractors" and insisted that they sign agreements to that effect in order to obtain employment, in violation of state and federal law.

15

89.     All of the above described retaliation is designed to further harm Plaintiffs and to pressure them to surrender their staff privileges, keeping them completely away from DMC.

### COUNT I
### VIOLATION OF THE MICHIGAN MEDICAID
### FALSE CLAIMS ACT, MCL § 400.610c

90.     Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

91.     The Michigan Medicaid False Claims Act ("Michigan Medicaid FCA") is an act "to prohibit fraud in the obtaining of benefits or payments in connection with the medical assistance program; to prohibit kickbacks or bribes in connection with the program; to prohibit conspiracies in obtaining benefits or payments; . . . to provide for civil actions to recover money received by reason of fraudulent conduct; . . . to prohibit retaliation; to provide for certain civil fines; and to prescribe remedies and penalties." Michigan Medicaid False Claim Act 72 of 1977. (Emphasis added).

92.     Additionally, "[a]n employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." MCL § 400.610c.

93.     An employer who violates this section is liable to the employee for all of the following:

(a)  Reinstatement to the employee's position without loss of seniority;

(b)  Two times the amount of lost back pay;

(c)  Interest on the back pay;

16

(d)  Compensation for any special damages; and

(e)  Any other relief necessary to make the employee whole. MCL § 400.610c(2).

94.     As employees, Plaintiffs took lawful acts in furtherance of an action under the Michigan Medicaid FCA.

95.     Defendants retaliated against Plaintiffs' by intentionally, maliciously and with reckless disregard for the truth of information they acted upon removing and/or failing to re-new their staff privileges.

96.     As a direct and proximate cause of Defendants' conduct, Plaintiffs have suffered damages including, but not limited to, loss of staff privileges and income, loss of career opportunities and emotional distress, including, but not limited to, embarrassment, humiliation and outrage.

## COUNT II
## RETALIATORY REMOVAL OF CLINICAL PRIVILEGES IN VIOLATION OF PUBLIC POLICY OF THE STATE OF MICHIGAN

97.     Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

98.     As described above, Plaintiffs exercised their rights and otherwise engaged in protected activity by exercising their responsibility to raise concerns, both verbally and in writing, and refusing to acquiesce in of violations, or suspected violations, of state and/or federal laws related to federal health care programs and state and/or federal laws, as set forth above.

99.     Defendants, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Plaintiffs and not renewing their clinical privileges.

100.    Defendants' actions were intentional, malicious, occurred with reckless indifference to Plaintiffs' rights and sensibilities, and with malicious and reckless disregard for the

truth of the information they acted on in revoking privileges. The actions were designed as retaliation for the aforesaid actions and for filing a federal lawsuit against them on March 25, 2019. This was also done with the purpose of removing Plaintiffs from the DMC properties so that they could no longer view and point out Defendants' illegal activities.

101.    The temporal proximity between Plaintiffs' protected activity and Defendants' materially adverse employment action is also a clear indicator of retaliatory conduct.

### COUNT III
### VIOLATION OF THE RETALIATION PROVISION OF
### THE FLASE CLAIMS ACT, 31 U.S.C. § 3730

102.    Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

103.    The retaliation provision of the False Claims Act ("FCA") protects any employee, contractor or agent from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3720(h)(1).

104.    On numerous occasions, Plaintiffs engaged in lawful acts, as set forth in more detail above, in effort to stop 1 or more violations of the FCA, including but not limited to, 31 U.S.C. §§ 3729(a)(1)(B), 3729(a)(1)(G), 3729(a)(1)(A) and 3729(a)(1)(C), by the Defendants.

105.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but the for Defendants' illegal conduct.

106.    Plaintiffs were subsequently retaliated against post-termination due to their protected activity. Their medical staff privileges have been removed and have not been reinstated.

107.    As a direct and proximate cause of Defendants' conduct of improperly retaliating against, investigating and terminating Plaintiffs, they have suffered damages including, but not limited to, loss of their jobs and income, loss of career opportunities, emotional distress, including but not limited to, embarrassment, humiliation and outrage.

108.    All of the above described retaliation is designed to further harm Plaintiffs and to pressure them to surrender their staff privileges, keeping them completely away from DMC.

**COUNT IV**
**BREACH OF CONTRACT**

109.    Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

110.    The By-Laws of the medical staff of the Detroit Medical Center are the governing agreement as to Plaintiffs' positions as to staff physicians at the DMC. Both Plaintiffs and the DMC are required to follow the By-Laws.

111.    Defendants are in possession of the By-Laws described above.

112.    The By-Laws, Article XIII set forth "Medical Staff Member Rights."

113.    Those rights include a "Fair Hearing" in all privileging actions.

114.    Those rights further include an "objective and evidence – based decision with regard to each request for clinical privileges.

115.    The Fair Hearing process requires a lack of reckless disregard and malice.

116.    Defendant, JCC members and executives violated Plaintiffs' rights by providing only a process with a preordained result.

<u>COUNT V</u>
**VIOLATION OF THE BULLARD-PLAWECKI**
**EMPLOYEE RIGHT TO KNOW ACT, MCL § 423.501, *et. seq.***
(*as to Dr. Kaki*)

117.    Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

118.    At all times material hereto, Plaintiff Kaki was an employee and Defendant DMC was an employer covered by and within the meaning of the Bullard-Plawecki Employee Right to Know Act, MCL § 423.501, *et. seq.*

119.    The primary purpose of the Bullard-Plawecki Employee Right to Know Act ("the Act") is to establish an employee's right to examine his personnel records, i.e. "the documents that are being kept by the employer concerning that employee."

120.    Per the Act, "Employer" means an individual, corporation, partnership, labor organization, unincorporated association, the state, or an agency or a political subdivision of the state, or any other legal, business, or commercial entity which has 4 or more employees and includes an agent of the employer.  MCL § 423.501(2)(b).

121.    Per the Act, "Personnel record" means a record kept by the employer that identifies the employee to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. MCL § 423.501(2)(c).

122.    Defendant DMC generated and maintained personnel record on Plaintiff Dr. Kaki during the course of his employment with Defendant.

123.    Defendant's records allegedly contain an "internal report" or other material which purports to set forth the reasons for Plaintiff's termination.

124.    According to Defendants, the "internal report" consists of an investigation by an

20

outside law firm and the results thereof.

125.    Plaintiff repeatedly requested, but was denied by Defendant, access to a complete copy of his employment records.

126.    To date, Defendant and its employees continue to willfully fail and/or refuse to comply with the Act and Plaintiff's demands for a complete copy of his personnel record(s), including the "internal report."

127.    Specifically, Defendant, while refusing to provide Plaintiff with a copy of the "internal report" or his personnel record(s), has casted Plaintiff in a negative light through its statements – those made publicly and to the media – regarding the cause for Plaintiff's termination, including that Defendant relied on an "internal report" for said termination.

128.    Defendant's intentional noncompliance with the Act threatens grave and irreparable harm to Plaintiffs' reputation, future employment opportunities and his legal rights.

### COUNT VI
### POST-TERMINATION RETALIATION AND
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### AND BUSINESS RELATIONSHIPS

129.    Plaintiffs repeat and re-allege each and every preceding paragraph as if fully set forth herein.

130.    Dr. Kaki has had clinical privileges with the DMC since 2012.  Dr. Elder has had clinical privileges at the DMC since 2008.

131.    On April 29, 2019, in a letter signed by Dr. Levy, and in conjunction with Dr. Tedeschi, Plaintiffs were advised that their privileges to practice medicine at the DMC were not being renewed.

132.    The procedures Defendants used with regard to the removal of Plaintiffs' clinical privileges were unusual and contrary to those outlined in the DMC Medical Bylaws.

21

133.    All four reasons cited in Defendants' April 29, 2019 letter for not renewing Plaintiffs' clinical privileges were pretextual. Plaintiffs never received a single written communication regarding any problems with their performance or explaining why their privileges were at issue.

134.    Plaintiffs had a legitimate and reasonable expectation of future business opportunities and economic benefit from their leadership positions and work at the DMC.

135.    Defendants had knowledge of such opportunities and economic benefit and intentionally interfered with them by suspending and revoking Plaintiffs' clinical privileges.

136.    The removal of privileges occurred as further retaliation against Plaintiffs for their actions described above, and was done to literally remove them from the DMC properties so that they could no longer view and have the ability to report Defendants' illegal actions.

137.    Defendants committed these tortious acts with deliberate and actual malice, ill-will and conscious disregard of Plaintiffs' rights.

138.    Removal of privileges is the most devastating action a hospital can take with regard to a physician and his or her career.

139.    Defendants' actions have disrupted and damaged Plaintiffs' relationships, business opportunities and professional lives and careers.

140.    By intentionally removing Plaintiffs' clinical privileges without good cause and in retaliation, Defendants have tortuously interfered with their prospective economic advantage and business relationships at the DMC and other hospitals.

## **RELIEF REQUESTED**

For all the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

**A.    LEGAL RELIEF**

22

1.    Economic, noneconomic and compensatory damages in whatever amount they are found to be entitled;

2.    Exemplary damages in whatever amount they are found to be entitled;

3.    Punitive damages in whatever amount they are found to be entitled;

4.    Liquidated damages, treble damages, and double damages in whatever amount they are found to be entitled; and

5.    An award of interest, costs and reasonable attorney fees.

**B.    EQUITABLE RELIEF**

1.    An order from this Court placing Plaintiffs in the position they would have been in had there been no wrongdoing by Defendants, including reinstatement with back pay;

2.    An injunction out of this Court prohibiting any further acts of wrongdoing;

3.    An Order requiring Defendants to immediately produce Dr. Kaki's personnel records;

4.    An award of interest, costs and reasonable attorney fees; and

5.    Whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  December 11, 2019

Respectfully submitted,
**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

## JURY DEMAND

Plaintiffs, by and through their attorneys Deborah Gordon Law, demands a trial by jury of all the issues in this cause.

Dated:  December 11, 2019

Respectfully submitted,
**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2019, I electronically filed the foregoing **Plaintiffs' First Amended Complaint** with the Clerk of the Court using the efile & eserve which will send notification of such filing to all counsel of record.

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiffs
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com